**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| BOBBY WEEKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  1:14-CV-56 NAB |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Bobby Weeks brings this action pursuant to 42 U.S.C. §§ 405(g)

and 1383(c)(3) seeking judicial review of the Commissioner's final decision

denying his application for disability insurance benefits (DIB) under Title II of the

Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and application for supplemental

security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All

matters are pending before the undersigned United States Magistrate Judge, with

consent of the parties, pursuant to 28 U.S.C. § 636(c).  Because the Commissioner

legally erred in her final decision, rendering the decision unsupported by

substantial evidence on the record as a whole, the decision is reversed.

### I.  Procedural History

On June 14, 2011, the Social Security Administration denied plaintiff's

March 2011 applications for DIB and SSI, in which plaintiff claimed he became disabled on September 7, 2010, because of coronary artery disease (CAD), emphysema, and chronic obstructive pulmonary disease (COPD). Plaintiff was forty-three years old when he applied for benefits. At plaintiff's request, a hearing was held before an administrative law judge (ALJ) on May 6, 2013, at which plaintiff and a vocational expert testified. On May 30, 2013, the ALJ denied plaintiff's claims for benefits, finding vocational expert testimony to support a finding that plaintiff could perform work that exists in significant numbers in the national economy. (Tr. 8-18.) On February 28, 2014, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-4.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff argues that the ALJ erred at Step 2 of the sequential analysis by failing to properly consider the severity of his mental impairments and by wholly failing to address his sleep disorder/insomnia impairment. Plaintiff also contends that the ALJ erred in her assessment of plaintiff's residual functional capacity (RFC) by failing to consider the effects of his mental impairments and sleep disorder and, further, by failing to articulate the evidence upon which she relied to support the RFC determination. Plaintiff contends that the ALJ's review of the evidence of

record is incomplete and that she should have more fully developed the record in order to obtain medical evidence to assist in determining his RFC. Plaintiff requests that the decision of the Commissioner be reversed and that the matter be remanded for further evaluation.

Because the ALJ failed to undergo the proper analysis at Step 2 of the sequential evaluation, the matter is remanded to the Commissioner for further proceedings.

## II. Testimonial Evidence Before the ALJ

At the hearing on May 6, 2013, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff's Work History Report shows him to have worked as a home remodeler from 1993 to 1998. From 1989 to 2007, plaintiff worked as a stocker in retail sales. He worked as a hospital janitor from March through August 2008. (Tr. 187.) Plaintiff testified that he stopped working in 2008 because his hours were reduced and he was placed on call, which required him to be present at the job site in case he was needed. He was not paid during this wait time, and he decided to quit because he could not continue in that routine. (Tr. 33.) Plaintiff sought no work after this position. Plaintiff testified that he was not functionally able to do any work around the house at that time and felt that, because of this, no one would hire him. (Tr. 45-46.)

Plaintiff testified that he suffered a heart attack in 2010 and underwent a procedure to have stents placed. Plaintiff testified that he was also diagnosed with COPD at that time, which rendered him unable to work. (Tr. 46.) Plaintiff testified that he currently gets out of breath if he does too much or engages in strenuous activities. He sometimes gets out of breath while just sitting or walking and becomes out of breath after walking about 100 feet. (Tr. 36-37.)

Plaintiff testified that he also has fibromyalgia from which he is in constant pain. Plaintiff testified that the pain requires him to frequently change positions. He can stand in one position for about fifteen minutes before needing to sit or lie down, and he continues to experience pain while lying down until he falls asleep. Plaintiff can sit about twenty to twenty-five minutes before needing to stand. (Tr. 36-37.) Plaintiff testified that, on good days, he can sit for up to forty minutes with no pain. Plaintiff sleeps all day on bad days. He has more bad days than good days. (Tr. 40-41, 43.) Plaintiff can lift about five pounds but with pain. He sometimes uses a cane to help him walk if he is experiencing pain in his side. (Tr. 38.)

Plaintiff takes pain medication, but it makes him sleepy. (Tr. 41.) Plaintiff testified that he also tries to do yoga stretches, which helps. Plaintiff testified, however, that he performs the exercises only on good days because they cause pain. Plaintiff's testified that his doctor told him that the exercise would help with

pain, but he has not yet experienced any relief.  (Tr. 43-44.)

Plaintiff testified that he has problems with nerves and with his memory. Plaintiff testified that he was currently seeing a therapist because his nerves are "a mess."  (Tr. 36.)  He experiences panic attacks during which he gets very nervous, feels sick to his stomach, is unable to think, and feels like crying.  (Tr. 40.)  With regard to his memory, plaintiff testified that he sometimes goes to a room and forgets why he went there.  (Tr. 38.)  Plaintiff takes Cymbalta, which makes him feel drowsy and droopy.  (Tr. 41.)

Plaintiff testified that he has problems with his sleep schedule in that he sleeps about six hours at night, three hours in the morning, and three hours in the afternoon.  Plaintiff testified that he sleeps a lot because of his depression, lack of motivation, pain, and inability to concentrate.  Plaintiff testified that his therapist is encouraging him to change his sleep therapy.  (Tr. 42.)

As to his daily activities, plaintiff testified that he does no chores except maybe rinsing a dish and putting it in the dishwasher.  Plaintiff lives with his two daughters, ages twenty-one and sixteen, who perform all of the chores.  He is able to shop with them.  Plaintiff has a driver's license but does not drive often. Plaintiff can attend to his personal care.  (Tr. 39, 45.)  He has no hobbies.  Plaintiff testified that he can watch a movie on the computer but it takes him all day to do so inasmuch as he must periodically pause the movie, stand, walk a little, stretch,

and take a nap.  Plaintiff reads while in bed.  (Tr. 41-42, 44.)  Plaintiff sleeps most of the day.  Plaintiff testified that he began to sleep excessively when he was diagnosed with fibromyalgia.  (Tr. 47.)

A vocational expert also testified at the hearing and was asked by the ALJ to assume a person of plaintiff's age, education, and work experience and to further assume that the person was "able to perform light work and alternate positions every 30 minutes with occasional postural's, and avoidance of concentrated exposure to cold, heat, pulmonary irritants and hazards."  (Tr. 49.)  The expert testified that such a person could not perform any of plaintiff's past work but could perform light work as a bench assembler, assembler-2, and mail clerk.  The expert also identified a number of sedentary jobs this person could perform.  (Tr. 49-51.)

The expert was then asked to assume the person needed to take an unscheduled break and lie down for up to an hour, to which the expert responded that such a requirement would eliminate all positions.   The expert also testified that being off task during fifteen percent of the workday because of concentration and memory issues would preclude all work, as well as being absent from work two to four times per month and/or needing to take two additional unscheduled fifteen-minute breaks.  (Tr. 51-52.)

### III.  Medical Evidence Before the ALJ

Plaintiff underwent a stenting procedure on September 7, 2010, after

suffering a heart attack. Two stents were placed. (Tr. 246-65.) Follow up examination with Dr. Christopher Montgomery on September 22 was normal in all respects. (Tr. 239.)

On October 12, 2010, plaintiff complained of shortness of breath and reported having experienced such shortness of breath since his heart attack. Plaintiff reported his condition to have worsened, with shortness of breath at rest, with any activity, and with speaking. Plaintiff reported not sleeping well and waking often. Pulmonary function tests showed mild obstructive defect. Physical examination was normal in all respects. Plaintiff was prescribed Combivent. On October 21, plaintiff reported improvement in his shortness of breath. It was noted that plaintiff had stopped smoking two weeks prior. Physical examination was normal in all respects. Plaintiff was diagnosed with COPD, arteriosclerotic heart disease (ASHD), and other dysfunctions of sleep. (Tr. 237-38.)

Plaintiff returned to Dr. Montgomery on February 15, 2011, and reported that he experienced intermittent, moderate chest pain and shortness of breath. Plaintiff's current medications were noted to be aspirin, BuSpar, Niaspan, Nitrostat, Plavix, Bystolic, Combivent, Flextra, Triamcinolone, and Qvar. (Tr. 235-36.) Chest x-rays taken that same date showed aortic atherosclerosis and mild interstitial markings in the lungs. The lungs were otherwise stable with no evidence of acute infiltrate or effusion. (Tr. 243.)

Plaintiff visited Dr. Alan N. Weiss, a cardiologist at Washington University School of Medicine, on February 22, 2011, and complained of radiating chest pain and increased shortness of breath. Plaintiff reported being unable to do anything because of shortness of breath. Dr. Weiss noted plaintiff's relevant history to include stent placement in September 2010 and coronary bypass in 2006. He also noted that plaintiff had asthma with wheezing for which he took Qvar. Diffuse decreased breath sounds were noted throughout both lungs, which Dr. Weiss opined could account for the shortness of breath. (Tr. 267-68.) A cardiac catheterization performed on February 23 showed normal left ventricular function, no evident valve disease, chronically occluded left anterior descending coronary artery with left internal mammary artery graft, and status-post stenting. Continued conservative management was noted to be most appropriate. (Tr. 360-62.)

Plaintiff returned to Dr. Montgomery on April 13, 2011, for follow up and reported that he began smoking again but wanted to quit. Plaintiff complained of all over achiness and some shortness of breath. Plaintiff also reported having some depression and anxiety. Plaintiff reported that he occasionally walked and engaged in light activity for exercise. (Tr. 234.)

On June 14, 2011, James W. Morgan, a psychological consultant with disability determinations, reviewed the evidence of record and determined that plaintiff did not have a medically determinable mental impairment. (Tr. 272-82.)

Plaintiff visited Dr. Montgomery on August 8, 2011, and reported having emotional issues with periods of hopelessness and depressive symptoms. Plaintiff reported that he had been "breaking down." Plaintiff's COPD was noted to be stable. Physical examination was normal in all respects. Plaintiff was noted to have normal mood and affect. Dr. Montgomery diagnosed plaintiff with anxiety and acute stress reaction/anxiety/emotional. Dr. Montgomery determined not to prescribe an antidepressant inasmuch as plaintiff did not do well with Prozac and Wellbutrin in the past "and ha[d] fairly stable symptoms at this point." Dr. Montgomery instructed plaintiff to continue with diet and exercise and recommended that he seek counseling to deal with emotional issues. Smoking cessation was also recommended. (Tr. 354-56.)

Plaintiff returned to Dr. Montgomery on November 7, 2011, and complained of occasional chest pain, nausea, left shoulder pain, and intermittent insomnia. Plaintiff reported that he walked or engaged in light activity for exercise. Plaintiff also reported experiencing some depression and anxiety. Dr. Montgomery noted plaintiff's current medications to be aspirin, BuSpar, Nitrostat, Flextra, Combivent, Triamcinolone, Qvar, and Bystolic. Examination showed anterior joint crepitus about the left shoulder but with full range of motion. X-rays showed mild osteoarthritis. Plaintiff's mood and affect were noted to be normal. Plaintiff was diagnosed with shoulder pain, anxiety, ASHD, COPD, hypercholesterolemia,

insomnia, and hypertension.  Ultram, Lunesta, and Ambien were prescribed, and plaintiff was instructed to return in three months.  (Tr. 350-53.)

On February 8, 2012, plaintiff reported to Dr. Montgomery that he continued to have shortness of breath despite having quit smoking the previous September. Plaintiff reported that he needs to yawn to catch his breath.  Plaintiff requested that he be continued on Ambien to help with sleep.  Dr. Montgomery noted plaintiff to be in no acute distress, to be oriented times three, and to have normal mood and affect.  Plaintiff's recent and remote memory, as well as his judgment and insight, were noted to be intact.  Dr. Montgomery diagnosed plaintiff with prostatitis, dermatophytosis of the foot, dyspnea, ASHD, COPD, hypercholesterolemia, hypertension, and insomnia.  Laboratory tests were ordered, and plaintiff was instructed to continue on his current medications.  (Tr. 345-47.)

On February 27 and March 9, 2012, plaintiff visited Dr. Montgomery with symptoms associated with sinusitis and gastroesophageal reflux disease (GERD). On March 15, plaintiff's prescription for BuSpar was refilled.  (Tr. 338-44.)

Plaintiff went to Poplar Bluff Medical Center on April 23, 2012, with complaints of an acute onset of scapular pain of unknown origin.  Plaintiff described the pain as mild.  Plaintiff reported experiencing the pain at rest and with movement.  Plaintiff was given Flexeril and was discharged that same date with diagnoses of back pain, ligamentous strain, and thoracic strain.  (Tr. 285-88.)

Plaintiff returned to Dr. Montgomery on May 30, 2012, with complaints of left upper quadrant pain and spasm. Diagnostic tests were ordered. No changes were made to plaintiff's treatment regimen. (Tr. 335-37.) Ultrasound of the abdomen was negative. (Tr. 334.) Chest x-rays showed COPD. (Tr. 333.)

Plaintiff visited Dr. Montgomery on June 13, 2012, who noted plaintiff's history of abdominal pain. Physical examination was normal. Dr. Montgomery diagnosed plaintiff with ASHD, other abdominal glucose, fatigue/malaise/lethargy, COPD, hypercholesterolemia, hypertension, and abdominal pain. BuSpar and Ambien were refilled, and laboratory testing was ordered. Plaintiff was instructed to return in one month. (Tr. 328-32.)

On July 13, 2012, Dr. Montgomery noted that plaintiff had no acute complaints but reported being fatigued, having shortness of breath, and having chronic insomnia and symptoms of restless leg syndrome. Plaintiff reported having trouble sleeping without Ambien, but that he had strange dreams with Ambien. Dr. Montgomery changed plaintiff's prescription from Ambien to Restoril, but plaintiff later called and requested Ambien. (Tr. 324-27.)

Plaintiff returned to Dr. Montgomery on August 28, 2012, who noted plaintiff to have muscle/joint pain and "multiple problems." Dr. Montgomery noted plaintiff to have daily symptoms of generalized pain and muscle discomfort, joint achiness, depressed mood, fatigue, headaches, occasional lightheadedness,

occasional palpitations, tenderness to touch, trouble falling and staying asleep, and morning stiffness. Plaintiff reported that stretching helped. Physical examination showed multiple trigger points, including the left elbow, bilateral sacroiliac, bilateral medial scapula, bilateral clavicle, and posterior cervical. Plaintiff's mood and affect were noted to be normal. Dr. Montgomery diagnosed plaintiff with fibromyalgia/myositis, fatigue/malaise/lethargy, joint pain, GERD, anxiety, ASHD, COPD, hypercholesterolemia, and hypertension. Plaintiff was continued on his medications, and Cymbalta was added to his medication regimen. Laboratory testing was ordered. (Tr. 320-23.)

On September 11, 2012, plaintiff reported modest improvement with his pain but that exercising caused increased pain. Dr. Montgomery noted plaintiff's current medications to be Nitrostat, Triamcinolone, Bystolic, Qvar, Flonase, Omeprazole, BuSpar, Trilipix, Ultram, Ambien, Combivent, aspirin, and Cymbalta. Plaintiff's mood and affect were noted to be normal. Previous laboratory testing yielded normal results. Dr. Montgomery diagnosed plaintiff with fibromyalgia and referred him to Rheumatology. (Tr. 318-19.) On September 18, plaintiff's Ambien, Cymbalta, and Ultram were refilled. (Tr. 317.)

Plaintiff returned to Dr. Montgomery on January 25, 2013, and reported that he did not follow up with Rheumatology because Cymbalta had helped improve all of his pain. Plaintiff currently reported having increased headaches as well as a

recurrence of minor pain in his left side and right elbow.  Plaintiff also reported
being stressed.  Plaintiff's medications were adjusted for sinusitis.  (Tr. 313-15.)

On February 13, 2013, plaintiff complained to Dr. Montgomery that he had
increased fatigue and joint/muscle pain.  Plaintiff's mood and affect were normal.
Plaintiff was instructed to increase Cymbalta.  (Tr. 309-11.)

Plaintiff underwent a consultative examination at Ozark Rheumatology on
March 19, 2013, with complaints of chronic pain and significant sleep disorder.
Plaintiff complained of having chronic pain for many years with no relief from any
medications.  Plaintiff reported being unable to do any physical activity for more
than half an hour because of pain.  Plaintiff reported shortness of breath and
decreased exertion tolerance.  Plaintiff also reported being unable to sleep and
getting no relief with Ambien or other sleep aids.  Dr. Geetha Komatireddy noted
plaintiff's past medical history to include diagnoses of COPD, CAD, and anxiety.
Plaintiff's current medications were noted to include Cymbalta, Combivent,
Ambien, hydrocodone, BuSpar, and Qvar.  Plaintiff was noted to walk with a cane
because of chest pain.  Physical examination was normal with normal range of
motion about all of the upper and lower extremities.  Twelve tender points were
noted, however, from which a diagnosis of fibromyalgia was made.  Plaintiff was
diagnosed with chronic active fibromyalgia syndrome, chronic pain, sleep disorder,
COPD, and anxiety and depression.  Dr. Komatireddy noted that plaintiff would

"definitely need[]" to both exercise and rest to help his fibromyalgia.  With respect to plaintiff's sleep disorder, Dr. Komatireddy discussed pharmacologic and nonpharmacologic remedies and recommended occasional rehabilitation.  Vitamins were ordered to address deficiencies leading to some symptoms.  Dr. Komatireddy recommended that plaintiff participate in physical therapy, exercise, and occasional rehabilitation.  Savella was prescribed.  (Tr. 302-06.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through June 30, 2013, and had not engaged in substantial gainful activity since September 7, 2010, the alleged onset date of disability.  The ALJ found plaintiff's CAD, fibromyalgia, and COPD to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13-14.)  The ALJ determined that plaintiff had the RFC to perform light work except he would need to alternate positions every thirty minutes; could only occasionally engage in postural activities; and needed to avoid concentrated exposure to cold, heat, pulmonary irritants, and hazards.  The ALJ found plaintiff unable to perform his past relevant work.  Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work as it exists in

significant numbers in the national economy, and specifically, bench assembler, assembler-2, and mail clerk. The ALJ thus found plaintiff not to be under a disability from September 7, 2010, through the date of the decision. (Tr. 15-17.)

## V. Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding

whether the claimant is engaged in substantial gainful activity.  If the claimant is

working, disability benefits are denied.  Next, the Commissioner decides whether

the claimant has a "severe" impairment or combination of impairments, meaning

that which significantly limits his ability to do basic work activities.  If the

claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner

then determines whether claimant's impairment(s) meets or equals one of the

impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's

impairment(s) is equivalent to one of the listed impairments, he is conclusively

disabled.  At the fourth step, the Commissioner establishes whether the claimant

can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the

Commissioner evaluates various factors to determine whether the claimant is

capable of performing any other work in the economy.  If not, the claimant is

declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by

substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v.

Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir.

2002).  Substantial evidence is less than a preponderance but enough that a

reasonable person would find it adequate to support the conclusion.  *Johnson v.

Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test,"

however, is "more than a mere search of the record for evidence supporting the

Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the

Commissioner has adopted one of those positions, the Commissioner's decision must be affirmed. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). The decision may not be reversed merely because substantial evidence could also support a contrary outcome. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

At Step 2 of the sequential analysis here, the ALJ found plaintiff's CAD, fibromyalgia, and COPD to be severe impairments. The ALJ specifically found plaintiff's hypertension, GERD, and depression and anxiety not to be severe. The ALJ did not address plaintiff's diagnosed sleeping disorder. Because the ALJ legally erred in her failure to undergo the proper analysis in determining the existence and severity of plaintiff's medically determinable impairments, the matter will be remanded for further consideration.

A.    <u>Severity of Mental Impairments</u>[1]

When determining the severity of a claimant's mental impairment, the Regulations require the Commissioner to undergo a special technique whereby the Commissioner rates the degree of functional loss the claimant suffers as a result of the impairment in the areas of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *See generally* 20 C.F.R. §§ 404.1520a, 416.920a.

When we rate the degree of limitation in the first three

---

[1] Plaintiff does not challenge the ALJ's determination that his GERD and hypertension are not severe impairments.

functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. . . .

. . .

If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities[.]

20 C.F.R. §§ 404.1520a(c)(4)-(d)(1) and 416.920a(c)(4)-(d)(1). At the initial and reconsideration steps of the administrative process, the Commissioner must complete a standard document outlining the steps of this technique. At the hearing and Appeals Council levels, application of the technique must be documented in the written decision. 20 C.F.R. §§ 404.1520a(e), 416.920a(e). "The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section." 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4). When mental impairments are present, the use of the technique is mandatory. *Cuthrell v. Astrue*, 702 F.3d 1114, 1117 (8th Cir. 2013).

Here, in finding plaintiff's diagnosed mental impairments of depression and anxiety not to be severe, the ALJ wholly failed to employ the four- and five-point scale to rate the degree of limitations in the four functional areas as required by the Regulations. Instead, the ALJ generally found the evidence not to show the

impairments to impose more than a minimal degree of limitation in plaintiff's daily

activities, social functioning, or ability to maintain concentration, persistence, or

pace. (Tr. 14.) While a "severe impairment" is generally defined as one that has

more than a minimal effect on an individual's physical or mental ability to do basic

work activities, *see* SSR 85-28, 1985 WL 56856, at \*4 (Soc. Sec. Admin. 1985),[2]

the severity of a *mental* impairment is nevertheless to be determined by the

additional sequential process set out in §§ 404.1520a, 416.920a. In this case,

however, the ALJ failed to undergo this process; and such failure constitutes error.

*Cuthrell*, 702 F.3d at 1118; *see also Collins v. Astrue*, 648 F.3d 869, 871-72 (8th

Cir. 2011) (an ALJ's failure to follow mandated procedure is legal error).

Citing §§ 404.1520a and 416.920a, the Commissioner contends that the

Regulations "make clear" that a claimant's mental impairments are not severe if

the limitations caused thereby are mild or none. (*See* Deft.'s Brief, Doc. #18 at p.

12.) While the undersigned agrees with the Commissioner's general statement of

the law, I cannot agree with the Commissioner's related characterization that the

ALJ's decision here supports a finding in accordance with the Regulations. As

discussed above, the ALJ neither invoked §§ 404.1520a, 416.920a nor followed

their mandated procedure in determining the severity of plaintiff's mental

impairments. If finding "no more than minimal limitations" is sufficient to find a

---

[2] *See also* SSR 96-3p, 1996 WL 374181, at \*1 (Soc. Sec. Admin. July 2, 1996); *Hudson v. Bowen*, 870 F.2d 1392, 1396 (8th Cir. 1989).

mental impairment not to be severe, then the Regulations' required use of the prescribed scale to determine the impairment's severity would be superfluous.

Because the ALJ legally erred by failing to follow the required special technique in determining the severity of plaintiff's mental impairments, the matter will be reversed and remanded to the Commissioner for proper analysis.

B.    Insomnia/Sleep Disorder

Plaintiff was first diagnosed with a sleep disorder in October 2010 and began seeking and receiving regular treatment for insomnia/sleep disorder in November 2011. The record shows that plaintiff continued to receive such treatment through March 2013, with various adjustments made because of continuing problems. Plaintiff's treating physician often noted plaintiff to be fatigued and to suffer from malaise and lethargy, and plaintiff testified that he experiences constant fatigue and sleeps most of the time on bad days. Despite substantial evidence of a diagnosed sleep impairment and its effects upon plaintiff, the ALJ's decision is devoid of any mention of this impairment.

Where an ALJ fails to consider the effects of a known medically determinable impairment, the RFC cannot be said to be supported by substantial evidence. *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). Here, the ALJ's failure to consider the existence of plaintiff's medically determinable sleep impairment resulted in her failure to consider the effects of such impairment in determining

plaintiff's RFC – either singly or in combination with the effects of plaintiff's other medically determinable impairments, including his mental impairments. "This failure violates the Social Security Act and constitutes reversible error." *Pratt v. Sullivan*, 956 F.2d 830, 835-36 (8th Cir. 1992) (per curiam). Although the ALJ may have considered and for valid reasons rejected evidence of plaintiff's sleep disorder, her decision is nevertheless silent in this regard. As such, this Court would be left to speculate as to whether any rejection of this evidence would be supported by substantial evidence on the record as a whole. This the Court cannot do. *See Jones v. Chater,* 65 F.3d 102, 104 (8th Cir. 1995).

Accordingly, this matter must be remanded to the Commissioner for consideration in the first instance of plaintiff's medically determinable sleep impairment. Such consideration shall include an analysis of the relevant evidence of record and a determination of whether and to what extent the impairment causes plaintiff to experience functional limitations; whether such limitations are so significant that the impairment must be considered a severe impairment under the Regulations; whether this impairment, either singly or in combination with plaintiff's other medically determinable impairments, meets or equals a listed impairment; and, finally, the extent to which the effects of this impairment – when considered in combination with plaintiff's other medically determinable impairments, both severe and non-severe – affect plaintiff's ability to engage in

work-related activities.  *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); 20

C.F.R. §§ 404.1545(a)(2), (e) and 416.945(a)(2), (e).

## VI.  Conclusion

The ALJ's failure to undergo the required technique in determining the

severity of plaintiff's mental impairments, and her failure to assess plaintiff's sleep

impairment at any step of the sequential analysis resulted in a legally deficient

decision regarding plaintiff's ability to perform work-related activities.  Given the

nature of the legal errors that occurred at the initial steps of the sequential analysis,

the Court need not proceed to consider plaintiff's other claims of error regarding

the ALJ's evaluation of the evidence and RFC determination.  *See Cuthrell*, 702

F.3d at 1118.

Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**REVERSED**, and this case is **REMANDED** to the Commissioner for further

proceedings.

A separate Judgment in accordance with this Memorandum and Order is

entered this same date.

Dated this 10th day of September, 2015.

   /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE